Filed 7/29/16  P. v. Zepeda CA2/1

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>RYAN ZEPEDA,<br><br>    Defendant and Appellant. | B262734<br><br>(Los Angeles County<br>Super. Ct. No. BA415199) |

APPEAL from a judgment of the Superior Court of Los Angeles County.  Monica Bachner, Judge.  Affirmed.

Leonard J. Klaif, under appointment by the Court of Appeal, for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

_____

A jury convicted appellant Ryan Zepeda of two counts of attempted premeditated, deliberate, and willful murder, and found that he committed the crimes in association with a criminal street gang. (Pen. Code, §§ 664, 187, subd. (a), 186.22, subd. (b)).[1] The jury further found that he personally used and discharged a firearm, causing great bodily injury to the victims. (§ 12022.53, subd. (d)). The court sentenced appellant to consecutive terms of life, with a minimum of 15 years pursuant to the gang enhancement, plus 25 years for the personal use enhancement. Appellant appealed.

We appointed counsel to represent appellant. Counsel filed a brief pursuant to *People v. Wende* (1979) 25 Cal.3d 436, raising no issues on appeal and requesting that we independently review the record to determine if the lower court committed any error.

We directed appointed counsel to send immediately the record on this appeal and a copy of the opening brief to appellant, and we notified appellant that within 30 days from the date of the notice he could submit by brief or letter any grounds of appeal, contentions, or argument he wished us to consider. Appellant filed a supplemental brief raising several issues, which we address below, and requesting new appellate counsel.

### STATEMENT OF FACTS

In the afternoon of July 25, 2013, Mario Gonzalez drove with his friend, Oscar Munoz, to Munoz's house. The house was within territory claimed by the Krazy Ass Mexicans, or KAM, gang. KAM territory is adjacent to area claimed by a rival gang, Big Hazard. As they pulled into Munoz's driveway a red or burgundy Lexus with gold trim drove past them, made a U-turn, and stopped behind them. A passenger in the Lexus got out of the car and approached Gonzalez's car. He wore a gray, hooded sweatshirt with a U.S.C. logo. He asked Gonzalez and Munoz where they were from; they replied that they were not from anywhere. The man said "Fuck KAM," or told Gonzalez and Munoz to say, "Fuck Kam," then shot both men several times. Munoz was shot in his face, arm, and back. Gonzalez was shot three times in his arm. One bullet passed through Gonzalez's arm and lodged in his chest. They both survived.

---

[1] All subsequent statutory references are to the Penal Code unless otherwise indicated.

Munoz's mother, Sandra Sanchez, was nearby when she heard the shots. She saw Munoz "lying down" in the car and a man standing nearby, who turned and pointed a gun at her. When the driver of the Lexus honked the horn, the man got into the car and left.

A police officer familiar with gang members in the area knew that a particular member of Big Hazard (not appellant) drove a burgundy Lexus with gold trim. The officer heard the report of the shooting and drove to the residence of the Big Hazard member, where he found the Lexus. He arrived about 15 to 20 minutes after the report of the shooting. The hood of the Lexus was hot, indicating that it had been recently driven.

Munoz selected appellant's picture out of a six-pack photo lineup, and said he was 75% sure that the man in the photograph was the shooter. At a different time and place, Gonzalez initially selected the photograph of someone other than appellant, but later identified appellant as the person who was probably the shooter.

During a search of appellant's residence, police found gray sweatshirts, "U.S.C. sweatshirts," and a U.S.C. football jersey.

During trial, Sanchez (Munoz's mother) identified one of the sweatshirts found in appellant's residence as the one worn by the gunman. Sanchez said she could not identify appellant in court because the gunman's hooded sweatshirt had covered much of his face.

Gonzalez and Munoz identified appellant in court as the shooter. Gonzalez explained that he initially selected the photo of someone other than appellant in the photo lineup because he did not want to testify at trial.

Los Angeles Police Officer Brian Cook testified as the prosecution's gang expert. According to Officer Cook, appellant is a self-admitted member of Big Hazard, and is known by the monikers, Nasty Boy and Koser. In March 2012, Cook arrested appellant for "tagging" structures and a tree in the area around Hazard Park, an area within Big Hazard's territory. Appellant was a juvenile at the time.

Officer Cook testified about Big Hazard's culture, organization, territorial boundaries, tattoos, gang signs, and its rivalry with KAM. According to Officer Cook,

3

the primary activities of Big Hazard are the commission of assaults with deadly weapons, burglaries, drug sales, and tagging the Big Hazard name or symbols. He testified about two prior convictions of Big Hazard gang members for murder and robbery.

Officer Cook explained that the act of shooting another gang member enhances the shooter's reputation within the gang and benefits the gang by instilling fear and respect in the neighborhood. When asked a hypothetical question based on the prosecution's evidence, Officer Cook opined that the shootings were done for the benefit of or in association with, or at the direction of, a criminal street gang.

Dr. Robert Shumer, a psychologist, testified for the defense as an expert regarding problems with eyewitness identifications. He identified various factors that can affect the accuracy of a witness's perception and identification, including stress, the passage of time, and the duration of the incident. He also testified as to how identification procedures, such a six-pack photo lineup, can affect the accuracy of an identification.

## DISCUSSION

In his supplemental brief, appellant states that he informed an investigating officer that he had an alibi and gave the officer the names of alibi witnesses who could testify on his behalf. The officer, however, testified at trial that appellant had no alibi and appellant's counsel offered no alibi evidence at trial. The argument suggests the possibility that his trial counsel was ineffective by failing to present alibi witnesses and failing to fully cross-examine the officer.

An appellant claiming ineffective assistance has the burden of establishing: (1) that his "counsel's representation fell below an objective standard of reasonableness"; and (2) "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland v. Washington* (1984) 466 U.S. 668, 688, 694.) In reviewing ineffective assistance claims, we employ a " 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance' " and will reverse convictions on direct appeal only when the record affirmatively discloses that counsel had no rational tactical purpose for

4

his or her act or omission.  (*Lucas* (1995) 12 Cal.4th 415, 437.)  "[U]nless the record reflects the reason for counsel's actions or omissions, or precludes the possibility of a satisfactory explanation, we must reject a claim of ineffective assistance raised on appeal."  (*People v. Ledesma* (2006) 39 Cal.4th 641, 746.)

Although appellant does not state that his attorney was aware of his alibi or his alibi witnesses, even if we assume he was so aware, we cannot conclude that his counsel was constitutionally deficient.  Whether to assert an alibi defense, to call particular witnesses, and cross-examine a witness about the appellant's alibi involve tactical and strategic decisions we cannot evaluate based on our record.  Counsel may have, for example, determined that the alibi witnesses were not credible and that their testimony would have been detrimental to the defense case.  Counsel may also have reasonably believed that cross-examining the officer on the point would have elicited evidence refuting the alleged alibi and, on balance, harmed the defense.  Because the record does not preclude the possibility that counsel's decisions have satisfactory explanations, we cannot determine that counsel was ineffective on this ground.

Appellant expressly raises ineffective assistance of counsel claim based on several grounds.  First, counsel failed to pursue the possibility that the victims' testimony could be stricken because they had been told that they had to testify in order to "receive protective custody" and avoid deportation.  He is referring to evidence that police informed Gonzalez and Munoz that relocation assistance may be available for witnesses who cooperate with the police, and informed Sanchez about the federal government's U-Visa program, by which victims of crimes who are otherwise subject to deportation may remain in the country.  These facts were introduced at trial and the jury was entitled to consider such evidence in evaluating the witnesses' testimony.  Appellant offers no argument or authority to support the contention that such evidence would support a motion to strike the witnesses' testimony.  His attorney's failure to make such a motion does not, therefore, constitute ineffective assistance.

Second, appellant contends that his counsel failed to seek to exclude evidence regarding his tagging arrest because the record of his juvenile adjudication had been

5

expunged. Even if the adjudication has been expunged—a fact not disclosed by our record—the expungement would not preclude evidence of the facts concerning the tagging incident. Such evidence was relevant to show appellant's connection with Big Hazard and his willingness to "put in work" for the gang. The record reveals no basis for excluding the evidence.

Third, counsel allegedly failed to introduce evidence of his good character, including evidence that he "was doing productive things in the com[m]unity," such as working two part-time jobs and being involved in gang intervention and a book club. He also graduated from high school and had "a handful of good character witnesses supporting" him. Because such evidence is not in our record, we cannot determine whether counsel was constitutionally deficient for failing to introduce it.

Fourth, appellant asserts that his counsel "never provided [him] with [his] transcripts" during trial. As a result, he knew "only what was being said in the courtroom" and what his attorney provided him. It is not clear what transcripts appellant is referring to or whether he requested such transcripts from his counsel. Even if we assume appellant asked his counsel for transcripts, that counsel had a duty to provide such transcripts, and counsel failed to provide them, appellant has made no showing that the result of the proceeding might have been different if he had been given the transcripts.

We have reviewed the record on appeal and are satisfied that appellant's counsel has fully complied with his responsibilities and that no arguable appellate issue exists. (*Wende, supra,* 25 Cal.3d at p. 441.) For this reason, we deny his request for new appellate counsel. We have also considered appellant's contentions and, for the reasons set forth above, conclude they are without merit. (See *People v. Kelly* (2006) 40 Cal.4th 106, 110.)

**DISPOSITION**

The judgment is affirmed.

<u>NOT TO BE PUBLISHED</u>.


                                                        ROTHSCHILD, P. J.

We concur:



CHANEY, J.



JOHNSON, J.

7